Cameron M. Hancock (5389)
Gregory S. Moesinger (10680)
**KIRTON McCONKIE**
Kirton McConkie Building, Fourth Floor
50 East South Temple
P.O. Box 45120
Salt Lake City, UT 84145-0120
Telephone: (801) 328-3600
Facsimile: (801) 321-4893
chancock@kmclaw.com
gmoesinger@kmclaw.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| OCEAN AVENUE LLC, a Wyoming limited liability company, KENN DUNN, an individual, and FRED NINOW, an individual,. | ***COMPLAINT AND JURY DEMAND*** |
| Plaintiffs, | |
| v. | Civil No. _____ |
| VISALUS INC., a Delaware corporation, NICHOLAS SARNICOLA, an individual, , and BLAKE MALLEN, an individual, NATE MOSER, an individual, PETER SIRAGUSI, an individual, MOSER & ASSOCIATES, a California corporation, and John Does I-XX. | Judge _____ |
| Defendants. | |

Plaintiffs Ocean Avenue, LLC ("Ocean Avenue"), Ken Dunn, and Fred Ninow,

(collectively "Plaintiffs"), by and through their attorneys of record, and for their

complaint against Defendants ViSalus, Inc. ("ViSalus"), Nicholas Sarnicola ("N.

Sarnicola"), and Mr. Blake Mallen ("Mallen"), Nate Moser ("Moser"), Peter Siragusi

("Siragusi"), Moser & Associates (the "P.I. Firm") and John Does I-XX (collectively

"Defendants") allege and state as follows.

## NATURE OF THE ACTION

1.      This Action arises out of Defendants' illegal, unethical and unconscionable

conduct including engaging in fraudulent and unfair or deceptive acts and practices in response

to a competitive challenge in the marketplace from a startup direct competitor, Ocean

Avenue. As described below, the complained of acts amount to violations of the

Racketeer Influenced Corrupt Organization Act ("RICO"), the Utah Pattern of Unlawful

Activity Act ("UPUAA"), Interception of Communications set forth in 18 U.S.C. § 2511

and Utah Code Ann. § 77-23a-4, Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a),

the Unfair Competition Act under Utah Code Ann. § 13-5a-1 *et seq.*, the Truth in

Advertising act under Utah Code Ann. § 13-11a-1 *et seq.,* and acts of Trespass and

Theft, Tortious Interference with Prospective Economic Advantage, Defamation,

Business Defamation, Unfair Competition, and Fraud under the common law of the State

of Utah.

## SUBJECT MATTER JUSIDICTION

### Jurisdiction

2.      This Court has original jurisdiction pursuant to the Racketeer and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1964; 28 U.S.C. § 1331, 1332, 1367, Section

43(a) of the Lanham Act, 15 U.S.C. § 1051, *et seq.* ("Lanham Act"), and 15 U.S.C.

§ 1121.

4833-0536-8853.4

3.      This Court has supplemental jurisdiction over claims in this Complaint which arise under the statutory and common law of the State of Utah pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form a part of the same case or controversy and derive from a common nucleus of operative facts.

4.      On information and belief, this Court has personal jurisdiction over Defendants, pursuant to Utah Code Ann. § 78-27-24(1), (3), due to their transacting and doing business in this state and conducting and causing other tortious injury and criminal activity in this state.

## Venue

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. §1965.

## Parties

6.      Plaintiff Ocean Avenue LLC ("Ocean Avenue") is a limited liability company organized under the laws of Wyoming with a principal place of business in Utah.

7.      Plaintiff Ken Dunn ("Dunn") resides in Whitby, Ontario, Canada, and is one of the owners and founders of Ocean Avenue, LLC.

8.      Plaintiff Fred Ninow ("Ninow") resides in Salt Lake County, State of Utah and is one of the owners and founders of Ocean Avenue.

9.      Defendant ViSalus is a corporation organized under Delaware law with its principle place of business located at 1607 East Big Beaver Road, Suite 110, Troy, Michigan 48083.

4833-0536-8853.4

10.     Defendant Nicholas Sarnicola ("Nic Sarnicola") is an individual who maintains residences in Florida and Michigan. Nic Sarnicola was a founder of Defendant ViSalus, is a major shareholder of ViSalus and is currently a "global ambassador" for ViSalus.

11.     Defendant Blake Mallen ("Mallen") is an individual who, upon information and belief, resides in California.  Mallen is a co-founder of Defendant ViSalus, a shareholder of ViSalus and holds the title of Chief Marketing Officer.

12.     Defendant Nate Moser ("Moser") is an individual who, upon information and belief, resides in Menlo Park, California and is a private investigator with a company called "Moser & Associates."

13.     Defendant Peter Siragusi ("Siragusi") is an individual who, upon information and belief, resides in Menlo Park, California and is a private investigator with a company called "Moser & Associates."

14.     Defendant Moser & Associates is upon information and belief a California corporation (the "P.I. Firm").

## ALLEGATIONS COMMON TO ALL COUNTS

### Visalus -- Background

15.     ViSalus was founded by Nic Sarnicola, Mallen and Ryan Blair in 2005 after the company that Nic Sarnicola and Mallen had previously worked for folded. Leading into 2008, while ViSalus' financial outlook was unstable and the company was in dire need of some assistance in order to survive, ViSalus was able to negotiate a deal to allow Blyth, Inc. ("Blyth"), a Connecticut based company, to acquire ViSalus in a

4

multi-phase buy-out. By the end of 2012, Blyth owned approximately 80% of ViSalus Holdings, LLC which is the 100% owner of Defendant ViSalus, Inc.

16.     ViSalus is a multi-level-marketing ("MLM") company that sells weight management products, nutritional supplements and energy drinks using the trademark ViSalus SciencesTM in promoting its products. ViSalus products are not sold through retail outlets but, instead, ViSalus relies on a network of distributors to market and sell ViSalus products directly to the public.

17.     ViSalus' business model is driven through the encouragement of distributors to grow product sales through the recruitment of other distributors. The distributors' performance is rewarded through a compensation plan which dangles significant, even 7 figure bonuses, as well as promises of BMW car payments for life in front of distributors, and by creating a buzz in the community by sponsoring and encouraging public meetings and gatherings that promote ViSalus and its products.

18.     ViSalus requires its distributors to meet certain goals including bringing in a number of other distributors "underneath" them[1] and they are assigned a "rank" to signify success. A distributor's success in recruiting, training, and developing other distributors is measured by the number of distributors that they directly recruit and the rank achieved by those distributors. Because nearly 100% of the distributors actually buy the product themselves, by growing this network of distributors, ViSalus reaches

---

[1] In theory, if a distributor signs up three new distributors and, in turn, each of those distributors sign up three more each, and so on, a visual depiction of that distributor's individual "network" will begin to look like a triangle.  The distributors below a certain person in line (those that the original distributor signs up) are known as the original distributor's "downline network."  Conversely, the people who signed up the original distributor, and above them line are known as the "upline network."

4833-0536-8853.4

more and more end users of their product. At the same time, the downward expansion of networks certainly serves to make the people at the very top of the payment platform more money through the compensation plan used by ViSalus.

19.     ViSalus reported significant sales numbers in 2010 and 2011. In August, 2012, Blyth announced plans to spin off ViSalus through an initial public offering.

20.     However, a few weeks later, in September, 2012, Moody's Investor Service downgraded Blyth's stock to negative and Blyth shortly thereafter withdrew its planned ViSalus IPO citing "uncertain market conditions." In fact, it is reported that Blyth's chief executive stated in a conference call that it pulled the IPO because ViSalus wasn't being "properly valued."

21.     Since Blyth's third quarter 2012 10-Q filing, it has become clear that ViSalus' sales are declining significantly as compared to the increases in past years. Further, on November 7, 2012, for the first time, ViSalus announced that its number of distributors shrank from the second quarter to the third.

### Ocean Avenue's Entrance in the MLM Market

22.     On October 1, 2012, Ocean Avenue launched and began promoting its own line of nutrition and weight management products.

23.     Unlike ViSalus as alleged below, Ocean Avenue does not allow the creation of false accounts to artificially prop up new distributors or make false promises of quick riches. Moreover, having been well aware of the reputation in the industry of other companies, Ocean Avenue has strived to maintain a compensation plan that does not hide anything from potential distributors.

4833-0536-8853.4

24.    As numerous distributors for ViSalus grew increasingly displeased with the compensation plan, the way ViSalus was treating them and/or the products that ViSalus was promoting, as is common in the MLM industry, many of those promoters began looking for other opportunities for income including looking at Ocean Avenue and other similar companies.

25.    In fact, in December, 2012, and January 2013, just a month or two after Ocean Avenue began competing with ViSalus, several individuals throughout the country who had earned significant ranks including national directors and ambassadors with ViSalus decided to leave ViSalus and join Ocean Avenue.

26.    However, as described in more detail below, upon the departure of many high income producing distributors, instead of making ethical business decisions to face this new competition head on, ViSalus intentionally engaged in unscrupulous acts of corporate espionage, corporate and personal defamation of Ocean Avenue and its founders, computer hacking into Ocean Avenue's computer system, the theft of a computer from Ocean Avenue's office, interception of Ocean Avenue's communications, interception of the communications of the owners of Dunn and Ninow, hacking into email accounts and social media accounts of Ocean Avenue's distributors, extortion, intimidation, coercion, threats and the filing of multiple lawsuits against distributors who had left Visalus, cut off back-office access without cause, cut off back-office access of any distributor thought to be "associated" with any disfavored distributor, withheld commissions earned.

4833-0536-8853.4

27.     This was all done in an attempt to stop the distributors from leaving and/or to stop Ocean Avenue's tremendous success and to put Ocean Avenue out of business or severally damage its ability for early growth, which is key for startup MLM business. Even after distributors have left ViSalus, ViSalus has maintained using these and other tactics to intimidate former ViSalus distributors.

### Visalus Engages in Corporate Espionage, Computer Hacking and Theft To Damage Ocean Avenue and its Owners

28.     In response to Ocean Avenue entering the market as a competitor with Visalus, Nic Sarnicola, , and Mallen on behalf of Visalus hired a private investigation firm called "Moser & Associates", in Menlo Park California (the "P.I. Firm").

29.     Nate Moser ("Moser") and Peter Siragusi ("Siragusi") are the private investigators with the P.I. Firm.

30.     Moser represents himself as having been a civilian operative working for Blackwater in Afghanistan and Iraq and an expert in investigations and personal protection.

31.     Moser has stated he is friends with the head of security for ViSalus who he knows from his military background.

32.     Moser has attended and participated in various ViSalus events.  *See* Exhibit E.

33.     The P.I. Firm at the direction of Visalus, and Nic Sarnicola hired a computer expert located in India referred to as "Sumit Vishoi" to access the email accounts of the former Visalus distributors working with Ocean Avenue, Ocean Avenue employees, Ken Dunn and Fred Ninow.

4833-0536-8853.4

34.     Kauri Thompson ("Kauri") is a former distributer with Visalus.  Kauri left Visalus and took a corporate position with Ocean Avenue.

35.     Kauri informed Mallen during a December 2012 meeting that he had taken a position with Ocean Avenue.  Mallen informed Kauri that Ocean Avenue could avoid a lawsuit with Visalus if Kauri provided Mallen with a list of all of the Visalus Distributors who had joined Ocean Avenue.

36.     Kauri was informed by Mallen that Nic Sarnicola and Mallen had an organized plan to go after Ocean Avenue and either put them out of business or seriously injure Ocean Avenues operations.

37.     After Kauri's meeting with Mallen, his Gmail account was hacked and accessed, his MSN email account was hacked and accessed and his facebook account was also hacked and accessed.  Kauri has still not been able to reopen his MSN email account.  Kauri's facebook account was also hacked and accessed by the PI Firm and it resulted in him losing 10 years of contacts he had generated in the MLM arena, which contacts are the lifeblood of a distributor in this industry.  Kauri's AT&T cell phone account information had also been changed and accessed.

38.     Upon information and belief, the PI Firm provided information and emails from Kauri's email accounts to Visalus, Nic Sarnicola, and Mallen.

39.     Additional Visalus distributors who joined Ocean Avenue had their email accounts and other social media accounts and cell phone accounts hacked into shortly after Visalus discovered they had signed up with Ocean Avenue.

9

40.     On several occasions, Visalus distributors signed up with Ocean Avenue on the Ocean Avenue computer network and server.  This information is only accessible on Ocean Avenue's computer network and server and not available to the public.

41.     Within a short period of time after various Visalus distributors signed up with Ocean Avenue, and prior to this information being made public, Visalus contacted these distributors informing them that Visalus had discovered they had signed up with Ocean Avenue and was terminating their association with Visalus.

42.     Upon information and belief, Visalus obtained and procured this information via the P.I. Firm who had accessed the Ocean Avenue private webpages using the services of Sumit Vishoi or another computer hacker hired by the P.I. Firm.

43.     Upon information and belief, the PI Firm hired by Visalus intercepted or attempted to intercept communications of Ocean Avenue and communications of its Directors and owners and accessed stored communications and documents on Ocean Avenue's server/computer system, cell phones, personal email accounts, the private Ocean Avenue website pages for the distributors of Ocean Avenue, and social media accounts of the owners of Ocean Avenue and the employees and distributors of Ocean Avenue.

44.     The PI firm hired by Visalus also placed "key logging devices" and/or gained remote access to the computers of Dunn, Ninow and Kauri.  The PI firm also obtained access to the Skype accounts for Dunn, Ninow and Karui.  The access and information obtained from these computers and Skype accounts were provided by the P.I. Firm to Nic Sarnicola and Visalus.

4833-0536-8853.4

45.     The communications intercepted and/or accessed by the PI firm were then disclosed and provided to Visalus at the direction of Nic Sarnicola and Visalus, which communications included but were not limited to: Ocean Avenue's client list, Ocean Avenue's distributor list, the identify of former Visalus Distributors who joined Ocean Avenue, information regarding ingredients and batch reports for Ocean Avenue products, internal marketing documents for Ocean Avenue, and emails, and privileged and confidential communications.

46.     Upon information and belief, Visalus used the information it obtained from the P.I. Firm, including confidential emails, in connection with the lawsuits described below that it filed to intimidate former Visalus distributors and to harm and damage the growth of its competitor Ocean Avenue.

47.     On or about November 29, 2012, Moser entered the business offices of Ocean Avenue in South Jordan, Utah after business hours illegally and without authorization or invitation of Ocean Avenue.  After illegally gaining access to Ocean Avenue's office, Moser removed and stole a computer from Ocean Avenue's office. Copies of video tape pictures of Mr. Moser stealing the computer are attached hereto as Exhibit A.

48.     Mr. Moser admitted to a computer hacker hired by Moser and the P.I. Firm that he stole the computer from Ocean Avenue's office.

49.     Mr. Moser stole the computer to further his attempts on behalf of Visalus and Nic Sarnicola to access and intercept communications and data from Ocean

4833-0536-8853.4

Avenue's server and computer system and disrupt and crash the Ocean Avenue computer server and system.

50.    The P.I. Firm hired another computer expert located in Northern California (the "U.S. Hacker").

51.    Moser informed the U.S. Hacker that the PI Firm had been hired by Visalus and Nic Sarnicola, and that Ocean Avenue was a threat to his client Visalus.

52.    Moser informed the U.S. Hacker in an email entitled "assignment" as follows:

> If you can get into either and obtain emails that would be great.  I would pay you to pull the email on a regular basis.  The target listed is Kauri Thompson in Salt Lake City and is an executive for Ocean Avenue. . . .  The whole company Ocean is a threat to my clients company.

A copy of this email is attached hereto as Exhibit B.

53.    Moser informed the U.S. Hacker that Visalus and Nic Sarnicola had hired Moser to obtain information about Ocean Avenue, its owners, and distributors for the following purposes:  (a) to shut down and destroy Ocean Avenue and Dunn; (b) to obtain Ocean Avenue's client and distributor lists; (c) to obtain access to Ocean Avenue's server to crash its computer system and damage its ability to do business; and (d) discovery embarrassing information that would harm Dunn, Ninow, and Ocean Avenue if the information was made public.

54.    Moser informed the U.S. Hacker that he had been hired in the past by Visalus and Nic Sarnicola to follow Dunn and to obtain information they could use to extort, threaten, or harm Dunn's personal and business reputation.

55.     Moser informed the U.S. Hacker that he had followed Dunn to a trip in Asia.  Moser followed Dunn hoping to tape record Dunn in compromising situations that could be used to embarrass Dunn personally and professionally.  Moser tape recorded Dunn giving a speech in Jakarta and then edited and spliced the footage and posted it on a YouTube page for a creator called "Ben Over."  The title of the video was "Ken Dunn owner of Ocean Avenue."  The main pieces of the edited video were taken out of context and contained statements giving the false impression that Dunn is a "professional liar", he "steals from people" and he "gives you permission to steal."

56.     Upon information and belief, Visalus had or has others on its behalf create and post additional websites that contain defamatory and false statements concerning Ocean Avenue, Ninow, and Dunn and their business ethics, business operations, and conduct that is allegedly dishonest or incompatible with the operations of a lawful business.

57.     The PI Firm instructed the U.S. Hacker to take actions to access Dunn's cell phone so that the PI Firm and Visalus could access and intercept communications on Dunn's cell phone.

58.     The PI firm communicated to U.S. Hacker in an email entitled "Get into Kens Iphone" containing the following instructions:

"The Iphone we want is 801-455-1528.  We have his login info for his icloud account witch [sic] is attached.  We Purchased you some software to get the job done, login info is same as usual, https:www.mobilespylogs.com/panel/login.php  Let me know when you get access to his phone so i can log in and view the results and listen in on his calls.  Keep downloading the server data so the client has something to go on and we can get you payed.

4833-0536-8853.4

A copy of this email communication is attached hereto as Exhibit C.

59.     The PI Firm accessed and obtained copies of Dunn's and Ninow's detailed cell phone records.

60.     The PI firm also sent the U.S. Hacker information and access to email accounts of distributors for Ocean Avenue and the owners of Ocean Avenue that Sumit Vishoi had accessed and hacked into for Visalus.

61.     For example, on May 29, 2013, Sumit Vishoi sent the PI Firm an email stating:

> Hi Nate, Here is the link to download [sic] the outlook file containing the mails from Karui Gmails.

A copy of this email is attached hereto as Exhibit D.

**Threats and Intimidation by ViSalus Against Ms. Nile, Ms. Then and Mr. Then**

62.     In 2012, Ms. Amber Then ("Ms. Then") a resident of Florida and at that time a distributor for Visalus became personally dissatisfied with ViSalus' products, noticing that she was having adverse physical reaction to the product to the extent that she could no longer consume the product. She additionally learned of many others experiencing similar severe physical side effects of the ViSalus product including bloating, gas, diarrhea and vomiting.

63.     Although she had been successful in achieving the Ambassador rank within ViSalus and had been earning a good income, she no longer personally believed in the product and started considering whether she should continue actively promoting the product.

4833-0536-8853.4

64.    In this same timeframe, and partially due to the side effects she and others experienced, Ms. Then, along with her brother (Mr. Then), and his girlfriend (Ms. Nile), started questioning ViSalus about the health effects of the product. In response, ViSalus largely avoided direct responses or refused to discuss details of its product.

65.    In asking questions about the product and attempting to figure out what was causing the side effects, Ms. Then also noticed that the label on the packaging of the shakes had been changed. The label had previously stated that the shake was isoflavone free. It now said that isoflavones were "reduced". Knowing that even trace isoflavones might cause a risk to certain individuals and knowing that she had relied on ViSalus' insistence that the shakes were isoflavone free, Ms. Then grew even more disenchanted with ViSalus.

66.    Additionally, throughout 2012, despite similar efforts being put into the product, Ms. Then, Mr. Then and Ms. Nile and many other distributors were experiencing a noticeable decline in sales and in the marketability of ViSalus' products.

67.    In the spring of 2012, a few days before commission checks were to be issued, Ms. Then noticed that one of her downline wholesale distributors which accounted for a significant amount of business each month, had suddenly disappeared from her downline.

68.    When Ms. Then asked her upline, Ashley Guerrera, about the disappearance, Ms. Guerrera said that she moved the account to help another of her distributors to achieve a certain level ranking for that month. The account was moved without Ms. Then's knowledge and caused her to lose monies due to her in the form of

15

commissions. This also directly violates ViSalus' Policies and Procedures. However, while ViSalus knew that Ms. Guerrera did this, there were no consequences to her.

69.     Given all of these confounding issues, Ms. Then told her upline five star ambassador that she wanted to leave ViSalus. This would have been considered, by almost any leader, as a gesture of respect.

70.     At the same time that these issues were occurring, Mr. Then had heard about Ocean Avenue through an acquaintance and decided that he wanted to learn more about its business model and products for himself. Given her growing desire to leave ViSalus, Ms. Then also decided to check out what Ocean Avenue had to offer.

71.     Ms. Then subsequently stopped actively promoting ViSalus to the extent she always had, but remained for a period of time actively involved in assisting her downline distributors.

72.     In October and November, 2012, Ms. Then was unsure what to do about her growing dissatisfaction with ViSalus in general. She understood that many of her downline distributors relied upon her for her support and knew that if she suddenly pulled out of ViSalus, it would cause a ripple effect.

73.     After learning about Ocean Avenue, Ms. Then decided that she was likely going to end her relationship with ViSalus and begin promoting Ocean Avenue products. However, Ms. Then also knew that when other ambassadors had left ViSalus in the past, ViSalus often withheld commissions owed to the downlines of the distributor who was leaving for no valid reason.

16

74.     Given the fact that this was all happening just before the holidays and knowing that December bonuses were particularly relied up by her team for holiday spending, Ms. Then decided to wait until after the December commission checks were paid out (scheduled to be paid on Friday, December 14, 2012), to formally leave.

75.     By late November, 2012, Mr. Then and Ms. Nile each independently decided that Ocean Avenue was a better opportunity for them, but similarly did not want to do anything to jeopardize the commissions of their downline distributors.

76.     However, feeling that they wanted to give their upline ambassador a heads up so as not to be blindsided, Mr. Then and Ms. Nile drove to Georgia to meet with their upline ambassadors, Ashley and Gonzalo Guerrera, to explain their decisions.

77.     While Mr. Then and Ms. Nile had no intention of attempting to persuade their uplines to leave ViSalus, to Mr. Then and Ms. Nile's surprise, during the meeting Ashley and Gonzalo indicated that they, too, were dissatisfied with ViSalus and had thought about leaving. They asked Mr. Then and Ms. Nile for information about Ocean Avenue. In fact, later that day, Gonzalo Guerrera contacted Ken Dunn, co-founder of Ocean Avenue, via text to ask for more information about the product and opportunities to promote.

78.     The next day, on November 25, 2012, Rhonda Lucero, a high ranking ViSalus distributor, and Nic Sarnicola called Ms. Nile's mother and began making false disparaging comments about Ninow, co-founder of Ocean Avenue, Ken Dunn and Ocean Avenue in general in an attempt to persuade Ms. Nile's mother to influence Ms. Nile to remain with ViSalus.

4833-0536-8853.4

79.    Later that day, there was a conference call held with several distributors including Nic Sarnicola, Mr. Then and Ms. Nile. In that conference call, Nic Sarnicola again made numerous disparaging an negative comments about Ocean Avenue. Nic Sarnicola also asked Mr. Then and Ms. Nile if they would stay if they could be guaranteed additional money. Both Mr. Then and Ms. Nile told him that they did not want more money to stay with ViSalus and that they were generally disappointed in ViSalus.

80.    Over the next few days, Mr. Then, Ms. Nile and Ms. Then were not sure of their exact relationship with ViSalus, but were simply trying to ensure that their downlines received their December commission checks prior to sending in formal resignations.

81.    On Tuesday December 11, 2012, Mr. Then, Ms. Nile and Ms. Then all got email letters from ViSalus stating that they had "credible sources" that they were working for Ocean Avenue and that their accounts would be shut off. At the same time, ViSalus shut off the accounts of approximately ten others who ViSalus thought were "associated" with Mr. Then, Ms. Nile and/or Ms. Then.

82.    Over the next day or two, other downline distributors of Mr. Then, Ms. Nile and/or Ms. Then indicated that various people within ViSalus were contacting them and making disparaging comments about Mr. Then, Ms. Nile and/or Ms. Then and about Ocean Avenue including, among other things, stating that they had acted illegally. Thus, ViSalus was already spreading vicious rumors and making knowingly untrue

4833-0536-8853.4

comments to other distributors in an effort to undermine the ability of Mr. Then, Ms. Nile and Ms. Then to succeed further either with ViSalus or anywhere else.

83.    In further conversations on December 12th, ViSalus told Mr. Then that they were concerned because there was an active url available on the Internet through Ocean Avenue showing Mr. Then's name. At this point, Mr. Then had been assigned a url from Ocean Avenue to hold his place with Ocean Avenue, but he had not yet become a promoter or distributor for Ocean Avenue. ViSalus told Mr. Then if he took his Ocean Avenue website down, they would turn back on access for him and everyone else who had their access cut off.

84.    Mr. Then immediately took down his url associating him with Ocean Avenue.

85.    Regardless, ViSalus did not live up to its promise: access was not restored.

86.    Instead, around 6 p.m. the next day, December 13th, Mr. Then received yet another email from ViSalus now making additional demands in order to get access restored prior to the 14th when commission checks were to be issued.

87.    Despite knowing that ViSalus had already failed to do what it promised, Mr. Then had no choice since others were counting on receiving those commissions. This time, ViSalus sent him an email demanding that he "resign from Ocean Avenue and cease all promoting for that company." The email also indicated that he should notarize and sign the email and return it to ViSalus and promise that he would not join Ocean Avenue for one year after leaving ViSalus at any time in the future.

4833-0536-8853.4

88.   Ms. Nile and Ms. Then both received similar emails and were also instructed by ViSalus that they had to sign and notarize these emails that day (despite the fact that it was almost 6 p.m. and no notary was available).  If they did not get the emails signed and notarized immediately, their downlines would not receive their commission checks.

89.   These threats were made despite the fact that ViSalus knew that it had no right to withhold the commissions from the downlines or from Mr. Then, Ms. Nile or Ms. Then because they had not done anything to violate the requirements to receive commissions that they earned.

90.   Having no ability whatsoever to bargain with respect to this "agreement" or to consult with legal counsel, and under intense pressure to sign the agreement immediately, Mr. Then, Ms. Nile and Ms. Then all signed the agreements simply so that their downlines would receive what they deserved — their holiday commission checks. ViSalus had effectively held a gun to each of their heads by using intimidation, coercion and their superior bargaining power to gain an unfair advantage and get what it wanted.

91.   Thus, in order to obtain value from Mr. Then, Ms. Nile and Ms. Then (a signed non-compete agreement), ViSalus made threats of withholding monies due to them and to other distributors.

92.   After signing the documents, account access was restored to Mr. Then and Ms. Nile on December 17th. However, Ms. Then was never given access to her account again.

93.     After trying to enjoy the holidays despite the bullying and threats she had endured from ViSalus, on December 28, 2012, Ms. Then sent in a formal resignation letter to ViSalus despite having already made it clear that she was leaving.

94.     Around the same date, Ms. Nile sent to ViSalus a sale of distributorship form indicating that she wished to sell her distributorship, per ViSalus' policies and procedures, to another individual as an attempt to extricate herself from ViSalus.

95.     Approximately two weeks after sending in the forms, Ms. Nile had not heard back from ViSalus about the sale, and she contacted ViSalus on January 9th.

96.     Despite having the right to transfer her distributorship pursuant to ViSalus' Policies and Procedures, Ms. Nile was told that she gave up the right to sell her distributorship. Ms. Nile simply ceased any continued contact with ViSalus relating to her account - at that point not wanting to put up with additional threats and lies from ViSalus.

97.     Despite the above events, to make it perfectly clear that they had both chosen to leave ViSalus following the December 14th checks being issued to their downlines, Ms. Nile and Mr. Then both sent formal final resignations to ViSalus dated January 17, 2013.

### Intimidation and Threats against Ms. Bohn

98.     In October, 2012, Ms. Lohren Bohn ("Ms. Bohn"), a ViSalus distributor who had always worked out of Wisconsin, was also noticing a downturn in business and earnings through ViSalus. She became aware of Ocean Avenue's promise and decided to check it out as a viable alternative.

4833-0536-8853.4

99.     Upon learning more about Ocean Avenue and making a decision to leave
ViSalus for Ocean Avenue, Ms. Bohn decided that, as a courtesy, she should tell her
upline 5 star ambassador, Johna Parr that she was going to leave.

100.    Instead of a civil parting of ways, however, Ms. Bohn was met with threats
and intimidation techniques in an effort to change her mind. In fact, Ms. Parr made
statements that OA was lacking in "leadership and funding," and went on to make
serious threats against Ms. Bohn personally that Ms. Bohn felt that she had to contact
the local authorities for protection.

101.    Although Ms. Bohn believed that Ms. Parr was acting with the knowledge
and consent of ViSalus, Ms. Bohn brought these threats and intimidation to the
attention of others with ViSalus only to be told there was nothing they would do.

102.    Later, Johna Parr and her husband, Matt Parr, began contacting Ms. Bohn's
downline distributors and started making untrue defamatory statements about Ms. Bohn
and about Ocean Avenue and its management team.

103.    In one such call, Ms. Parr indicated that Jason O'Toole (ViSalus' number
2 top earner, second only to Nic Sarnicola) sat down with ViSalus' five star
ambassadors and specifically had a meeting to warn them all about Ken Dunn and
Ocean Avenue. In that same conversation, Mr. Parr added that "Ms. Bohn pissed Nick
[Sarnicola] off and [Sarnicola] is going after her with his lawyers." Threats were also
made by Johna and Matt Parr that if ViSalus found out that any additional distributors
were looking at or associated in any way with Ocean Avenue, ViSalus would
immediately shut down that distributor's account.

104.   Ms. Bohn cut all ties with ViSalus and began promoting Ocean Avenue products.

**Coercion and Entrapment of Ms. Van Etten**

105.   While associated with ViSalus as a distributor, Ms. Michelle Van Etten ("Ms. Van Etten"), a distributor at the time for Visalus who worked out of her home while raising two young children. Ms. Van Etten had worked promoting other products through online auction sites in the past and, pursuant to ViSalus' policies and procedures, primarily promoted ViSalus products through an online eBay store.

106.   At all times of conducting her eBay store, Ms. Van Etten complied with ViSalus' Policies and Procedures with respect to selling the product online, which specifically allows for the sale of products on auction web sites if the product price remains above or equal to wholesale pricing or preferred customer pricing.

107.   Regardless, in late 2012, ViSalus began publishing negative information about Ms. Van Etten stating that she was violating ViSalus' intellectual property by using the trademark without permission. ViSalus initiated online disputes through e-Bay with Ms. Van Etten alleging that she violated the law and otherwise caused harm to her reputation as an online seller through publishing knowingly false statements of a similar nature about her.

108.   At the same time, ViSalus wrote to Ms. Van Etten directly and alleged that she violated ViSalus' Policies and Procedures and that she did not have permission to sell the ViSalus product at the pricing she was offering.

109.   Along with this correspondence, ViSalus sent Ms. Van Etten a revised copy of Policies and Procedures which she had never been given before. Despite never

4833-0536-8853.4

having seen them before, ViSalus stated that Ms. Van Etten was breaking these policies and threatened her status as a distributor.

110.   While Ms. Van Etten did not violate any trademark laws and did not infringe in any way on ViSalus' trademark in promoting the product, ViSalus caused negative information to be associated with her eBay account and with her reputation which created negative feedback. As ViSalus was aware, in the world of eBay selling, a seller's feedback is critical to his or her success and reputation on the site and, with negative information about her value as a seller, her ability to continue to successfully promote ViSalus on eBay was greatly reduced.

111.   Just prior to the problems with being accused of trademark infringement, Ms. Van Etten had been coerced and pushed into participating in ViSalus' Bimmer Club. Prior to ViSalus' improper attack on her character, Ms. Van Etten had been selling in excess of $40,000 of ViSalus products each month, and with that sales volume she had no doubt that she could maintain the proper status remain active in the Bimmer club and have her car payments made by ViSalus. Unfortunately, after the unjustified attacks on her character by ViSalus, business started slowing down to the point that her sales would no longer qualify her for the car payment.

112.   On November 1, 2012, ViSalus suspended Ms. Van Etten's account.

113.   Further, before conducting or finishing an investigation, ViSalus began telling Ms. Van Etten's uplines that they had to fire her because she had engaged in illegal acts.

24

114.   At this point, Ms. Van Etten had begun looking for other opportunities in the MLM industry and learned of Ocean Avenue. Ms. Van Etten did begin promoting Ocean Avenue products in November, 2012, after being improperly cut off from ViSalus' network.

115.   After joining Ocean Avenue, Ms. Van Etten contacted eBay sellers and asked, "Are you a promoter at ViSalus? If not, I've got a great opportunity for you..."

116.   Ms. Van Etten received one particular response and later talked to the individual who texted her. The individual specifically told her that he was in no way connected with ViSalus. Upon hearing that, she started explaining the virtues of joining Ocean Avenue to the caller.

117.   Later, Ms. Van Etten learned that this particular individual who contacted her was actually employed by ViSalus and that the conversation was a "sting" that ViSalus set up to attempt to "catch" her soliciting a ViSalus distributor to join Ocean Avenue. ViSalus made threats against Ms. Van Etten as a result of this conversation and, in doing so, revealed that they had illegally tape recorded the conversation without her knowledge or consent.

### Using Lawsuits as an Intimidation Tactic
### And Damage the Growth of Ocean Avenue

118.   On November 26, 2012, less than a month after improperly terminating its agreement with Ms. Van Etten, and without warning of any kind, ViSalus filed a lawsuit in the Circuit Court of Florida in Hillsborough County and filed a Motion for a Preliminary Injunction Without Notice. Visalus, Inc. vs. Ms. Van Etten, Case No: 12-

018306; Div. G. In its motion, ViSalus asked the Court to grant an injunction against Ms. Van Etten without even having to give her notice of the request.

119.   Through this formal court proceeding, ViSalus attempted to intimidate Ms. Van Etten asking for an immediate injunction against her prohibiting her from soliciting or recruiting ViSalus employees or distributors, both active and inactive, and prohibiting her from participating in any network marketing program, specifying Ocean Avenue.

120.   Interestingly, counsel for ViSalus was, at this same time, engaging in discussion with a representative of Ocean Avenue to attempt to work through ViSalus' concerns about the circumstances surrounding the departure of several ViSalus ambassadors who were alleged to be working for Ocean Avenue.

121.   However, despite the ongoing relationship with Ocean Avenue and discussions on a global level of distributors leaving ViSalus for Ocean Avenue, ViSalus made the conscious decision not to tell Ocean Avenue about Ms. Van Etten. Instead, ViSalus choose to ask the Court not to even give this housewife and mother of a disabled child an opportunity to prepare or respond to the request for an oppressive injunction which was far broader than anything ViSalus would have been entitled to.

122.   Luckily, Ms. Van Etten was able to appear in Court regarding the potential injunction. When she arrived, however, counsel for ViSalus approached Ms. Van Etten and told her that if she simply agreed to an injunction, ViSalus would not go after her for attorneys' fees and costs of having to get the injunction. Having no legal

experience, Ms. Van Etten was intimidated and told the attorney that she would consider his offer.

123.    In fact, ViSalus' counsel was attempting to get Ms. Van Etten to agree to admit that she violated a valid restrictive covenant, to provide a broad and general release to ViSalus, to agree to a consent judgment against her prohibiting her from contacting any distributor of ViSalus, and to complete an "interview by ViSalus' counsel, under oath and in the presence of a court reporter, in which ViSalus' counsel will ask her questions regarding her reasons for leaving ViSalus for Ocean Avenue and the circumstances regarding her departure from ViSalus and her becoming affiliated with Ocean Avenue."  These terms suggested by ViSalus were far more expansive than he could have ever hoped to have received had the matter been decided by a Judge.

124.    Further, despite the fact that ViSalus was discussing a possible consent judgment against Ms. Van Etten which included the full relief asked for in his Complaint, ViSalus did not simply halt efforts in that lawsuit. Instead, it took advantage of this lawsuit and the opportunity to get free "discovery" from Ocean Avenue.

125.    Despite maintaining "friendly" discussions with Ocean Avenue on related topics, instead of being open with Ocean Avenue about the lawsuit or ViSalus' desire to obtain information from Ocean Avenue, ViSalus and its attorneys proceeded to use the discovery process in Ms. Van Etten's lawsuit to secure a subpoena that it could serve on Ocean Avenue to compel certain documents to be produced in Florida.

126.    ViSalus pushed for this subpoena as a way to conduct a fishing expedition and hopefully gain a tactical advantage against ViSalus' competitor - Ocean Avenue.

27

127.   ViSalus has additionally brought nearly identical lawsuits against several other Visalus distributors who left Visalus to join Ocean Avenue.

**Lawsuits Brought Against Ms. Nile, Mr. Then and Ms. Then**

128.   Ms. Chelsea Nile is a former distributor of Visalus .

129.   Thus, on January 22, 2012, ViSalus instituted a lawsuit against Mr. Then and Ocean Avenue based on the extorted non-compete agreement in addition to other claims. Visalus, Inc. v. Mr. Then and Ocean Avenue LLC; In the Circuit Court of the Fourth Judicial Circuit, in and For Duval County, Florida; Case No: 16-2013-CA-000686.

130.   Two days later, on January 24, 2012, ViSalus filed a nearly identical lawsuit against Ms. Nile. Visalus, Inc. v. Ms. Nile and Ocean Avenue LLC; In the Circuit Court of the Fourth Judicial Circuit, in and For Duval County, Florida; Case No: 162013-CA-000822.

131.   Approximately a week later, ViSalus filed yet one more lawsuit against Ms. Then in. ViSalus, Inc. v. Ms. Then and Ocean Avenue, United States. District Court for the Southern District of Georgia, Case No. 4:13-cv-00028.

132.   The lawsuits against Mr. Then, Ms. Nile and Mr. Knox have been removed and are all pending in the U.S. District Court for the Middle District of Florida while the lawsuit against Ms. Then is still currently pending in Georgia.

133.   ViSalus also sought immediate injunctive relief in each of these lawsuits.

4833-0536-8853.4

**Lawsuit Filed Against Ms. Bohn**

134.   While working with counsel for Ocean Avenue in response to the lawsuits in Florida and Georgia, on January 29, 2013, ViSalus filed a lawsuit in Michigan against Ms. Bohn, a stay at home mother living in rural Wisconsin, alleging that she improperly solicited her 18 year old son to leave his relationships with ViSalus to begin working with her at Ocean Avenue.

135.   ViSalus filed this lawsuit in Michigan, despite the fact that Ms. Bohn has never set foot in Michigan and none of the allegations in the lawsuit occurred in Michigan, in an attempt to argue that more favorable laws of Michigan applied to Ms. Bohn's relationship with ViSalus. Visalus, Inc. v. Ms. Bohn, United States District Court, Eastern District of Michigan, Case No.: Case No. 2:13-cv-10366. Had ViSalus sued Ms. Bohn in Wisconsin where she lives and where the alleged actions occurred, ViSalus knew that the law would not support their contention that Ms. Bohn had engaged in any improper actions.

136.   Similarly, on February 14, 2013, ViSalus attempted to employ the same tactic and filed suit against yet another former ViSalus distributor, Kody Smith, a Colorado resident who is accused by ViSalus of improperly soliciting people in Colorado and California. *Visalus, Inc. v. Kody Smith,* United States District Court, Eastern District of Michigan, Southern Division, Case No: 2:13-cv-10631-JCO-RSW. Regardless, as with Ms. Bohn, ViSalus sued Mr. Smith in Michigan because Colorado law would not support ViSalus' theories that Mr. Smith has done anything wrong.

4833-0536-8853.4

**Continued Defamatory Acts**

137.   In addition to instituting these lawsuits against its largest earners who left ViSalus to go to Ocean Avenue, ViSalus and its remaining ambassadors have also stepped up their efforts to defame and ruin the reputations of former distributors who have left Visalus to work with Ocean Avenue and the business reputations of Ocean Avenue and its management team.

138.   As late as February 19, 2013, Nic Sarnicola and other ViSalus ambassadors such as Rhonda Lucero continue to send numerous text messages and emails and making false statements about Ocean Avenue and its management and threatening the distributors with being sued if they decide to leave, while asking what it will take to get the people who have not yet officially left to stay.

139.   Additionally, false statements continue to be made by various individuals on behalf of ViSalus about the Plaintiffs in an effort to ruin their reputations which ViSalus knows are critical in the MLM marketplace.

140.   As demonstrated by the acts described throughout this Complaint, it is clear that ViSalus has resorted to and will continue to resort to illegal, unethical, and vicious and fraudulent and threatening acts to attempt to compete against worthy competitors in the marketplace.

**False and Misleading Advertising by ViSalus About Isoflavones**

141.   ViSalus sales and distributes a product called Vi-Shape in interstate commerce.

4833-0536-8853.4

142.   ViSalus promotes and advertises its Vi-Shape shake mix as follows: "Each protein has been specially processed to remove fat, remove lactose and remove carbohydrates. "In addition, we have processed the soy to remove the isoflavones, so there is no estrogenic  affect.- (Emphasis added.) However, in contrast to this prominent and repeated statement made by ViSalus, the package itself for the Vi-Shape shake mix indicates that isoflavones have been reduced and not removed.

143.   The presence or absence of isoflavones is important, particularly to persons going through chemotherapy or who have thyroid or other hormonal issues, due to the medical effect of isoflavones on the thyroid and on hormonal production. The ingestion of isoflavones to these individuals can be extremely harmful and could even be fatal in sufficient quantities.

144.   ViSalus has indicated in numerous published statements that it processes the soy it uses to remove the isoflavones through water filtration. However, the processing of soy that would be required to remove isoflavones would render the soy devoid of any value as a protein source. Thus, this processing seems, at least, at odds with the benefits ViSalus claims are added through the soy.

145.   Further, it is obvious that "reduction" and "removal" of anything are not equivalent. Therefore, one of the two statements that ViSalus promotes are false and misleading to the public, to consumers and to its distributors who are required to be knowledgeable about the product that they are attempting to promote.

4833-0536-8853.4

**ViSalus' Recruiting Strategies**

146.   Contrary to the guidelines set out by the FTC, ViSalus makes revenue claims and entices people to join their scheme by making those individuals believe that they are about to "get rich quick."

147.   ViSalus' strategy is to recruit new people, prop them up to the level of director or ambassador quickly, make them feel beholden to ViSalus so that they remain loyal, and then leave the majority of them to fend for themselves with no real structure beneath them to be truly successful while ViSalus focuses on new people to prop up with fake promises and stories of quick riches.

148.   For example, ViSalus' compensation plan highlights the following statement:

> If you personally sponsored 3 Active Associates who each have 3 customers on a $49 Balance kit each month, and duplicated that effort through 8 levels of referral, you would earn $72,324 per month just from your team commission."

Next to and underneath that statement, ViSalus states: "Fail this example by 95% and still earn $3,616 per month." Thus, the clear suggestion is that you should be making five figures a month easily, but even if you are really bad at selling, you will make at least $3,616 per month.

149.   While continuing to send that statement out over the internet, via mail and through handing out flyers and promotional information, ViSalus knows that the actual average amount earned by a ViSalus distributor is closer to $50 per month with many distributors actually losing money each month if you factor in the amount the distributor

32

4833-0536-8853.4

spends on the product for him or herself. Regardless, ViSalus uses this intentionally

deceptive message because it knows that it will entice more people to sign up as

distributors.

150.   In fact, ViSalus fails to disclose to its new distributors that, on average, in

the first half of 2012, a ViSalus distributor bought $1,286 in products and earned $1,638

in commissions, netting $352 over six months (which does not take into account any

costs, expenses, travel or income taxes that the distributor will be responsible for

because they are acting as an independent contractor). Regardless of this average,

Defendant continues to widely disseminate and support the myth that everyone who

signs up as a distributor for ViSalus can get rich quick.

151.   As an example, Nic Sarnicola expressed ViSalus' goals to a crowd of

directors at a 2012 Miami meeting which was recorded and published on You Tube. In

the video, he states:

> So I want you guys to make a distinction here between what the
> marketing message is and what the business model is. The
> marketing message is 'challenge, challenge, challenge.' But once
> you've got somebody in as a promoter, it's 'director, director,
> director.

152.   ViSalus' promises of the ability for anyone to succeed are made despite

the company knowing full well that its dropout or "churn" rate of distributors is

estimated by one publication to be annualized at over 190% as opposed to an annualized

churn rate of other major MLM companies which are estimated around 50-60%.

33

153.   ViSalus also manipulates numbers in order to be able to announce a high number of total "non-distributor customers." For example, in June, 2012 ViSalus proclaimed that it had over 1,000,000 non-distributor customers.

154.   What ViSalus doesn't make readily or easily known about this number is that a non-distributor customer is defined as anyone who is not a distributor who has purchased products at least once in the previous 12 months. At the same time, an individual distributor is defined as someone who is <u>currently</u> eligible to earn a commission. Therefore, that reported number of over 1,000,000 is inflated to include the distributors who have left ViSalus within the previous 12 months which, according to one reportedly conservative estimate from November, 2012, is a minimum of 150,000 people. Thus, the number reported by ViSalus to extol its "successes" of non-distributor customers is intentionally and artificially inflated by at least 10-15%.

### The Promise of a Big Quick Bonus

155.   Another aspect of ViSalus' recruitment strategy is exposed through its acclaimed rewards offered to those who achieve certain ranks with large cash "bonuses" through its compensation plan.

156.   When a distributor achieves a certain rank, he or she is given an oversized foam-board mockup of a check for $25,000, $100,000, $250,000, $500,000, or even $1,000,000. However, the distributor is only actually credited that money over a lengthy pay-out period if he or she maintains the status each month going forward. ViSalus also suggests that a $1,000,000 bonus is available, but of the over 100,000 distributors

4833-0536-8853.4

working for ViSalus, only four distributors have ever hit this mark including Nic

Sarnicola.

157.   While ViSalus hands out these fake oversized checks to distributors and

encourages the distributors to tote them around to parties to show off in an attempt

entice more people into the "get rich quick" mindset, ViSalus knows full well that the

great majority of these bonuses will never be fully paid.

158.   In fact, ViSalus usually "awards" these checks to its distributors at large

public meetings often attended by thousands of people. A distributor is brought on stage

and boasted as the kind of person who can succeed quickly. ViSalus records these

presentations and ensures that the video is published and promoted on social media sites

thus enticing others to want to achieve the "success" that ViSalus knows is generally

unsustainable.

159.   When each new ViSalus distributor signs up to promote ViSalus'

product, it sends, through the U.S. Mail, a package which includes a copy of ViSalus'

compensation plan. The compensation plan which largely created and reviewed by

ViSalus' CMO, Mallen, contains representations of fact, including promises of large

bonuses that ViSalus knows is relied upon by distributors and specifically relied upon by

the individual Plaintiffs in this lawsuit. ViSalus makes these false representations in its

compensation plan with the intention that it will induce individuals to sign up and act as

distributors of ViSalus.

160.   This scheme described above is practically identical to the scheme at the

root of a recent suit filed by the Federal Trade Commission ("FTC") against Fortune Hi-

4833-0536-8853.4

Tech Marketing ("FHTM") where the FTC describes the deceptive earnings claims and operation of an illegal pyramid scheme stating that,

> FHTM dangles the promise of riches in order to lure consumers into joining its scheme. FHTM makes these promises in a variety of ways — through in person presentations, pre-recorded presentations, webcasts, and live and pre-recorded conference calls — but no matter what the medium, the company's rags to riches tales are patently false for nearly everyone who joins.... At FHTM's most recent national convention, FHTM paraded its top thirty earners on stage with a mock-up of a $64 million check.

Similarly, a picture of Defendants Nic Sarnicola and A. Sarnicola being paraded on stage with a mock-up of a $1,000,000 check has been published on numerous sites on the internet and is held out by ViSalus as a story of what you can achieve if you only sign up with ViSalus.

### Enrolling Pets and Fake People as ViSalus Distributors and Assignment of False Sales Volume

161.   Another common practice that ViSalus is aware of and supports is used by its leading distributors to sign up new distributors is to create fake or phantom sales volume in order that ViSalus may falsely represent to unsuspecting recruits that those who have recently joined have achieved immediate outrageous success.

162.   This scheme includes knowingly setting up fake distributor accounts (often in the name of pets or other fictitious people with fake social security numbers) in order to create false downline money that new distributors will believe is guaranteed income in the future. ViSalus' "sales pitch" to keep momentum going is that "You too can achieve success quickly."

4833-0536-8853.4

163.   In fact, Plaintiffs are aware of numerous ambassadors for ViSalus engaging in a practice of using rollover money which they hold in what is known as a "waiting room." This by itself is not improper [nor does it] create any false impressions. However, instead of putting this volume in the waiting room to be assigned to the next distributor who signs up, ambassadors often enroll fake people as distributors and assign the volume to alleged "legs" underneath the new distributor. The new distributor is led to believe that he or she already has a "leg" of business in his or her downline, and thus becomes qualified to receive bonuses/commissions, without having to do any work and that by signing up; he or she will be guaranteed that, at least this sales volume will be there. Thus, ViSalus lulls the new distributor into a false sense of security that the amount of money credited at the start up is essentially a given.

164.   As an alternative scheme, ViSalus encourages distributors trying to build their networks to insert new enrollees in line above existing people who are already "loyal" to ViSalus as a way to gain "leverage" to motivate the new distributors.

165.   This scheme of misrepresentation to new ambassadors is used to prop individuals up, push them up through the ranks quickly and allow them to qualify for certain statuses including up to the rank of regional director which allows them to participate in the "Bimmer Program" described below. By doing this, ViSalus gains the advantage of being able to make the same pitch to the next distributor that "you too will get rich quick."

166.   ViSalus also manipulates its database by moving established legs or downline distributors within an organization so that those above may appear to have

advanced into a higher rank when, in fact, that rank was only achieved because of the manipulation. This occurs even at the peril of, and often without knowledge of, the person who actually signed up that downline account and who is losing the benefit of that money in his or her direct line.

167.   Additionally, after a distributor reaches a certain rank for even one month, for example, that of ambassador, even if he or she never again qualifies for that rank, he is encouraged and, in some cases, required by ViSalus to still hold himself out to be of that rank while promoting the product. Therefore, a distributor who holds himself out to be an ambassador may have only reached the sales volume of an ambassador once and perhaps only because of a manipulation of the database.

168.   Thus, while a new and unsuspecting potential distributor may believe that there are hundreds or thousands of active promoters who regularly achieve ambassador sales volume leading the potential recruit to believe that she too can achieve that rank easily, in fact, very few of those "ambassadors" actually maintain the sales volume on a regular basis that would allow them to qualify as an ambassador.

169.   These actions described above are contrary to the FTC statement: "Be aware of shills — fake references paid by the company or distributor to pretend they were successful earning money through the plan."

### The "Bimmer Program"

170.   One of ViSalus' most deceptive programs used to create false enthusiasm for its product is to "allow" its top earners to participate in what is known as the "Bimmer Program."

4833-0536-8853.4

171. ViSalus has created a relationship with BMW of North America LLC and BMW Financial Services to execute this scheme which is touted as being a "reward" for hard working distributors.

172. Instead, this program and the ability to obtain the promised car payments "for life", promoted by both BMW and ViSalus, is knowingly misrepresented to new distributors in yet another scheme to create false enthusiasm for both BMW and for ViSalus ' s products.

173. A condition of participation in the "Bimmer Club" is that the distributor displays ViSalus logos on the license place holder and emblem on the car once he or she buys or leases the black BMW.

174. ViSalus promotes its "Bimmer Program" as a "BMW Bonus for LIFE" in various marketing resources. As but one example in the attached copies of an active website state: "You can earn a BMW bonus for life for promoting the challenge." Both ViSalus and BMW know that this statement is misleading and false.

175. These false and misleading statements create false enthusiasm among potential distributors who only later find out that they must purchase the BMW in their own name and are only allotted $600 / month toward a BMW if they maintain the level of sales in their down-line each month.

176. Additionally, ViSalus pressures and in most instances, requires its distributors who reach the regional director level to purchase a BMW through this program. The distributors who reach this level are told that they will not succeed as a distributor unless they participate in this program.

4833-0536-8853.4

177.   Unfortunately, many of these young, new distributors who have seen tremendous personal income in a short amount of time due to manipulations of their actual downline earning capacity, sign up for the "Bimmer Club" only to have their payments made for a month or two and then they have a hard or impossible time re-qualifying.

178.   This is because, after ViSalus and BMW lock the individual into a deal and create more visual support for ViSalus in the community, ViSalus stops putting efforts into propping up this distributor who now has the extra threat of having to make a large car payment as extra motivation to stay loyal to ViSalus. Once they have a distributor on the hook for the price of a new BMW, ViSalus can focus efforts on new unsuspecting distributors who can soon be driving around in another ViSalus branded BMW.

179.   Numerous ViSalus distributors who were propped up by false downline income and who purchased a BMW through the "Bimmer Program" have only been left with ruined credit because it was impossible to maintain the level of sales required to continue the car payments. In fact, it is estimated that more than 50% of ViSalus representatives who join the "Bimmer Program" ultimately end up missing payments or having their car repossessed by BMW.

180.   By forcing the distributors to participate in this Bimmer Program, ViSalus and BMW have created false expectations of the distributors that they will be able to maintain the monthly sales and re-qualify for their car payments to be paid every month. However, ViSalus also gains leverage over these independent distributors who typically

40

are free to work as much or as little as they want and who are typically free to end their distributor relationship with ViSalus at any time. Additionally, because they have now been saddled with significant personal debt, these distributors are beholden to ViSalus and many feel that they have no choice but to continue as a distributor despite any other personal desires. These acts by ViSalus and BMW are deceptive and unconscionable.

181.   Not only are these distributors forced to continue to promote ViSalus, BMW has implemented a terror campaign to ruin their credit when a distributor falls behind on the car payment. Each BMW representative, while on the stage waving at the crowd during the numerous ViSalus conventions and meetings, knows that this program will result in financial ruin and destruction to hundreds, if not thousands, of unsuspecting distributors caught up in the hype of the moment.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 2511 – Interception of Electronic Communications)

182.   Plaintiffs re-allege each of the allegations contained in the above paragraphs as if fully set forth herein.

183.   Defendants violated 18 U.S.C. § 2511 because they:

(a)  intentionally intercepted, endeavored to intercept, and procured any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

(b) intentionally used, endeavored to use, or procured any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:

(i)  such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or

41

(ii) by knowing, or having reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or

(iii) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or

(c) intentionally disclosed, or endeavored to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally used, or endeavored to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

184.   As a result of the Defendants' actions, Plaintiffs have been damaged in an amount to be proven at trial, including but not limited to the damages provided for in 18 U.S.C. § 2520 (b) and (c)(2), in the amount of Plaintiffs damages and any profits made by Visalus resulting from each violation, punitive damages and Plaintiffs' attorneys fees and costs.

## SECOND CLAIM FOR RELIEF
### (Violation of Utah Code Ann. § 77-23a-4 – Interception of Communications Act)

185.   Plaintiffs re-allege each of the allegations contained in the above paragraphs as if fully set forth herein.

186.   Defendants violated Utah Code Ann. § 77-23a-4 by:

(a) intentionally or knowingly intercepted, endeavored to intercept, or procured any other person to intercept or endeavor to intercept any wire, electronic, or oral communication;

4833-0536-8853.4

(b) intentionally or knowingly used, endeavored to use, or procured any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication, when the device is affixed to, or otherwise transmits a signal through a wire, cable, or other like connection used in wire communication or when the device transmits communications by radio, or interferes with the transmission of the communication;

(c) intentionally or knowingly disclosed or endeavored to disclose to any other person the contents of any wire, electronic, or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic, or oral communication in violation of this section; or

187.    Plaintiffs have been damaged by the Defendants repeated violation of Section 77-23a-4 and are entitled to damages and the relief set forth in Utah Code Ann. § 77-23a-11, which damages will be proven at trial,  plus punitive damages and an award of their attorney's fees and costs.

### THIRD CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962 (c)
### (CIVIL RICO – ALL DEFENDANTS)

188.    Plaintiffs re-allege the allegations in the above paragraphs and incorporate the allegations by reference.

189.    ViSalus, Nic Sarnicola, Mr. Mallen, Moser, Siragusi, The P.I. Firm, Mr. Blair and others associated with ViSalus, such as Jason O'Toole, Rhonda Lucero and Johna Parr engaged in a malicious campaign against Ocean Avenue, Dunn and against former ViSalus distributors who decided to leave ViSalus and who now are associated with Ocean Avenue for the common purpose of destroying and/or damaging and putting Ocean Avenue out of business, disrupting its computer system and resources and extorting the plaintiffs.

190.    Nic Sarnicola, and Mallen controlled and ran the RICO Enterprise and these individuals associated together for the common purpose of the scheme and goal to damage,

43

destroy and put Ocean Avenue out of business and destroy the business and personal reputations of the plaintiffs.

191.    The Enterprise engaged in a pattern of racketeering by intercepting and accessing electronic communications and information in violation of 18 U.S.C. § 2511 and Utah Code Ann. § 77-23a-4, by hiring the P.I Firm to break into and steal a computer from Ocean Avenue's offices, by engaging in Malicious Cyber Activity in violation of Utah Code Ann. § 13-5a-102 *et seq.,* and intimidating its current and prior distributors, publishing defamatory statements, using extortion and threats against its current and former distributors in an attempt to either keep them from leaving ViSalus or to ruin their reputation to damage their ability to succeed at Ocean Avenue, publishing defamatory statements against and about Ocean Avenue directly, and manipulating and using the legal system to gain an advantage against Ocean Avenue, including accessing privileged and confidential communications.  These acts constitute a violation of the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* ("RICO").

192.    At all relevant times the Defendants were persons within the meaning of RICO §§ 18 U.S.C. 1961(3) and 1964(c).

193.    At all relevant times, ViSalus, Nic Sarnicola, Moser, Siragusi , the P.I. Firm, Mr. Blair, Mr. Mallen, Ms. Lucero, Mr. O'Toole, and Mr. Parr formed an association-in-fact for the purposes of harming and lessening a competitive threat posed by a competitor in the marketplace — Ocean Avenue. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

194.    At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce, within the meaning of RICO, 18 U.S.C § 1962(c).

4833-0536-8853.4

195.   At all relevant times, Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity," within the meaning of RICO, 18 U.S.C. § 1961(d), in violation of RICO 18 U.S.C. §1962(c).

196.   Specifically, at all relevant times, Defendants engaged in a "racketeering activity" within the meaning of 18 U.S.C. § 1961 (1) by engaging in the acts set forth above. Through use of wires and Internet and use of the U.S. Mail, and through repeated violations of 18 U.S.C. § 2511, Utah Code Ann. § 77-23a-4, and Utah Code Ann. § 13-5a-101 *et seq.* Defendants engaged in fraudulent activity by making material misrepresentations to new ViSalus distributors about the ability to earn and maintain certain commissions and certain levels of success within ViSalus without disclosing the internal intentional manipulation of the system that created fake and false expectations. Defendants also engaged in threats of extortion as that term is understood under Utah and Florida law as it related to obtaining valuable promises by Plaintiffs Ms. Then, Mr. Then, Ms. Nile, Mr. Knox, Ms. Van Etten and Ms. Bohn through use of threats and intimidation.

197.   Defendants' acts have damaged Ocean Avenue in its ability to enter and remain in the market place and damaged it sales and revenue and potential for growth as a startup company.  These acts, and the acts set forth above, constitute a violation of one or more of the following: 1) 18 U.S.C. § 1343 (wire fraud), 2) 18 U.S.C. § 1341 (mail fraud); 3) repeated violation of 18 U.S.C. § 2511 and Utah Code Ann. § 77-23a-4; 4) malicious cyber activity; 5) hiring the P.I. Firm to break into Ocean Avenue's office and steal a computer; and 6) an act or threat involving extortion which is chargeable under State law and punishable by imprisonment

45

for more than one year. During the relevant time period, Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

198.   As a result of their misconduct, Defendants are liable to Plaintiffs for their losses in an amount to be determined at trial.

199.   Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

**FOURTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962 (c)**
**(CIVIL RICO – ALL DEFENDANTS)**

200.   Plaintiffs re-allege each of the allegations above and incorporate the same by reference.

201.   At all relevant times, Defendants Nic Sarnicola, Mr. Mallen, Moser, and Siragusi (collectively the "Individual Defendants") were persons within the meaning of RICO §§ 18 U.S.C. 1961§§ (3) and 1964(c).

202.   At all relevant times, ViSalus was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4) which was operating for the purpose of harming and lessening a competitive threat posed by a competitor in the market place.

203.   At all relevant times, the enterprise was engaged in and its activities affected interstate commerce within the meaning of RICO 18 U.S.C. § 1982(c).

204.   At all relevant times, the Individual Defendants conducted or participated in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(d), in violation of RICO, 18 U.S.C. § 1962(d).

4833-0536-8853.4

205.   Specifically, at all relevant times, the Individual Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961 (1) by engaging in the acts set forth above. Through use of wires and Internet and use of the U.S. Mail, breaking into Ocean Avenue's office and stealing a computer, procuring person to hack into the Defendants computers, cell phones, social media accounts, email accounts, the Individual Defendants also engaged in fraudulent activity by making material misrepresentations to new ViSalus distributors about the ability to earn and maintain certain commissions and certain levels of success within ViSalus without disclosing the internal intentional manipulation of the system that created fake and false expectations. The Individual Defendants also engaged in threats of extortion as that term is understood under applicable state law as it related to obtaining valuable promises by Ms. Then, Mr. Then, Ms. Nile, Ms. Van Etten and Ms. Bohn through use of threats and intimidation to try to prevent them from working with Ocean Avenue.

206.   The Individual Defendants' acts deprived Plaintiffs of their right to operate their business without encountering the unfair business practices employed by the Defendants to try to destroy and limit Ocean Avenue's growth and revenue from future distributors. These acts, and the acts set forth above, constitute a violation of one or more of the following: 1) 18 U.S.C. § 1343 (wire fraud), 2) 18 U.S.C. § 1341 (mail fraud); 3) repeated violation of 18 U.S.C. § 2511 and Utah Code Ann. § 77-23a-4; 4) malicious cyber activity; 5) hiring the P.I. Firm to break into Ocean Avenue's office and steal a computer; and 6) an act or threat involving extortion which is chargeable under State law and punishable by imprisonment for more than one year. During the relevant

4833-0536-8853.4

time period, the Individual Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

207.   As a result of their misconduct, the Individual Defendants are liable to Plaintiffs for their losses in an amount to be determined at trial.

208.   Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

**FIFTH CLAIM FOR RELIEF**
**Civil RICO Conspiracy**
**Violation of 18 U.S.C. § 1962(d)**

209.   Plaintiffs reallege each of the allegations contained in above paragraphs as if fully set forth herein and incorporated the same herein.

210.   At all relevant times, the individual Plaintiffs were "persons" within the meaning of RICO, 18 U.S.C. § 1961(3) and 1964 (c).

211.   At all relevant times, the Defendants were persons within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

212.   At all relevant times, ViSalus, Nic Sarnicola, Blair, Moser, Siragusi, the P.I. Firm, Mr. Mallen, Ms. Lucero, Mr. O'Toole and Mr. Parr formed an association-in-fact for the purposes of harming and lessening a competitive threat posed by a competitor in the marketplace — Ocean Avenue. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

213.   At all relevant times, this enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. §1961(4).

48

214.   As set forth in the above, the Defendants conducted or participated directly or indirectly in the conduct of the enterprise's affairs through a "pattern of racketeering activity", within the meaning of RICO, 18 U.S.C. § 1961 (5), in violation of 18 U.S.C. § 1962(c).

215.   At all relevant times, the Defendants associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962, that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

216.   As a result of the Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs were harmed in an amount to be determined at trial.

217.   Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

### SIXTH CLAIM FOR RELIEF
### Civil RICO
### Violation of 18 U.S.C. § 1962(d)

218.   Plaintiffs repeat and reallege each of the allegations contained in the above paragraphs as if fully set forth herein and incorporate the same herein.

219.   At all relevant times, the Individual Plaintiffs were "persons" within the meaning of RICO, 18 U.S.C. § 1961(3) and 1964 (c).

220.   At all relevant times, the Individual Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

221.   At all relevant times, ViSalus was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4) which was operating for the purpose of harming and lessening a competitive threat posed by a competitor in the market place.

4833-0536-8853.4

222.   At all relevant times, this enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. §1961(4).

223.   As set forth in the above, the Individual Defendants conducted or participated directly or indirectly in the conduct of the enterprise's affairs through a "pattern of racketeering activity", within the meaning of RICO, 18 U.S.C. § 1961 (5), in violation of 18 U.S. C. § 1962(c).

224.   At all relevant times, the Individual Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962, that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

225.   As a result of the Individual Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs were harmed in an amount to be determined at trial.

226.   Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

## SEVENTH CLAIM FOR RELIEF
### (Utah Unfair Competition Act – Malicious Cyber Activity)
### Violation of Utah Code Ann. § 13-5a-101 *et seq.*

227.   Plaintiff  Ocean Avenue repeats and realleges each of the allegations contained in the above paragraphs as if fully set forth herein and incorporates the same herein.

228.   Defendants engaged in Malicious Cyber Activity and Unfair Competition in violation of Utah Code Ann. § 13-5a-101 *et seq,* that was unlawful and fraudulent by:

(a) Obtaining the unlawful access to computer resources to intimidate and coerce the Defendants;

(b) Accessing the Plaintiffs' computers without authorization;

50

(c) Intentionally intended to disrupt the Plaintiffs' computer resources; or

(d) Intentionally intended to materially damage and disrupt directly and indirectly damage the Plaintiffs' computer resources

229.    Defendants violation of the Utah Unfair Competition Act has led to diminishing the value of Ocean Avenue's intellectual property and has damaged the Plaintiffs in an amount to be proven at trial.

230.    Pursuant to Utah Code Ann. § 13-5a-103, Plaintiffs are entitled to an award of damages for their respective actual damages, attorneys' fees and costs, and punitive damages.

## EIGHTH CLAIM FOR RELIEF
### False Advertising under the Lanham Act

231.    Plaintiffs re-allege each of the allegations contained in the above paragraphs as if fully set forth herein and incorporate the same herein.

232.    The acts of Visalus alleged herein constitute unfair competition and false and misleading descriptions of fact, and/or false or misleading representation of fact, all in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

233.    These acts of unfair competition, false or misleading descriptions of fact, and/or false or misleading representation of fact have been made by Technip in commercial advertising and/or promotion, misrepresenting nature, characteristics and qualities of the rights, properties, and products offered by Visalus, all to the harm of Ocean Avenue and the public.

234.    Ocean Avenue has been harmed and is likely to be harmed and damaged by these acts of unfair competition and is entitled to injunctive relief and damages in an amount to be proven at trial, together with its attorney's fees and costs and punitive damages.

4833-0536-8853.4

## NINTH CLAIM FOR RELIEF
### Violation of the Utah Truth in Advertising Act

235.   Plaintiffs re-allege each of the allegations contained in the above paragraphs as if fully set forth herein and incorporate the same herein.

236.   The acts of Visalus alleged herein constitute deceptive trade practices pursuant to Utah Code Ann. § 13-11a-3(1).

237.   Ocean Avenue has been damaged by the acts of Visalus in an amount to be proven at trial.

238.   Pursuant to Utah Code Ann. § 13-11a-4, Ocean Avenue is entitled to an award of its damages, together  with its attorneys' fees and costs, the promulgation of corrective advertising, and injunctive relief.

## TENTH CLAIM FOR RELIEF
### Trespass, Conversion and Theft

239.   Plaintiffs re-allege each of the allegations contained in the above paragraphs as if fully set forth herein and incorporate the same herein.

240.   Defendant Moser entered the Ocean Avenues offices without authorization or invitation after regular business hours.

241.   Defendant Moser wrongfully removed without authorization an computer owned by Ocean Avenue.

242.   Defendants conspired with Moser to break into, trespass and steal the Ocean Avenue Computer.

243.   Ocean Avenue is entitled to immediate possession and ownership of the computer.

244.   Defendants do not have any possessory  or ownership rights to the computer.

4833-0536-8853.4

245.   Defendants actions constitute a wrongful trespass onto Ocean Avenue's property and the conversion and theft of its computer.

246.   Ocean Avenue has been damaged by the Defendants' actions in amount to be proven at trial.

247.   Ocean Avenue is entitled to award of damages against the Defendants for their wrongful trespass, theft and conversion of its computer.

### ELEVENTH CLAIM FOR RELIEF
### Conspiracy to Commit Trespass, Conversion Theft, Interception of Communications and Violation of Utah Code Ann. § 13-5a-101 *et seq*

248.   Plaintiffs re-allege each of the allegations contained in the above paragraphs as if fully set forth herein and incorporate the same herein.

249.   Nic Sarnicola, Mallen, and Visalus conspired with Moser, Siragusi, and the P.I. Firm to commit the various  illegal acts alleged herein as set forth in the First, Second, Seventh and Tenth Claims for Relief.

250.   Defendants actions constitute a wrongful trespass onto Ocean Avenue's property, conversion and theft of its computer and illegal interception of communications and accessing stored electronic information, and a violation of Utah Code Ann. § 13-5a-101, et. seq.

251.   The common purpose and goal of the conspiracy was to improperly disrupt, interfere with, and destroy Ocean Avenue's opportunities and growth as a competitor with Visalus.

252.   Ocean Avenue has been damaged by the Defendants' actions in amount to be proven at trial.

253.   Ocean Avenue is entitled to award of damages against the Defendants.

4833-0536-8853.4

**TWELFTH  CLAIM FOR RELIEF**
**Violation of the Utah Unlawful Activity Act**

254.    Plaintiffs re-allege each of the allegations contained in the above paragraphs as if fully set forth herein and incorporate the same herein.

255.    The Defendants constitute an enterprise pursuant to Utah Code Ann. § 76-10-1602.

256.    The acts of the Defendants constitute a pattern of unlawful activity pursuant to Utah Code Ann. § 76-10-1602.

257.    The Plaintiffs have been damaged by the acts and pattern of unlawful activity of the Defendants in an amount to be proven at trial.

258.    Pursuant to Utah Code Ann. § 76-10-1605, Plaintiffs are entitled to an award of twice their damages, plus their attorneys' fees and costs.

**THIRTEENTH CLAIM FOR RELIEF**
**Defamation**

259.    Plaintiffs re-allege the allegations in the above paragraphs and incorporate the allegations by reference.

260.    Persons holding themselves out to speak for ViSalus including but not limited to the individual defendants, have  made false and defamatory statements to third parties and ViSalus distributors via email, text, and/or in telephone or in-person conversations relating directly to Plaintiffs  Dunn, Ocean Avenue, Mr. Knox, Ms. Then, Mr. Then, Ms. Nile, Ms. Van Etten and/or Ms. Bohn.

261.    These defamatory statements were all made without reasonable care to the truth or falsity of the statements.

4833-0536-8853.4

262.    Many, but not all of the defamatory statements directly and falsely accused some or all of the above listed individuals of having committed a crime or having engaged in criminal behaviors or engaging in activities not compatible with their business.

263.    The Plaintiffs have been greatly harmed in their business and personal reputations as a result of these defamatory statements.

### FOURTEENTH CLAIM FOR RELIEF
### Conspiracy to Commit Defamation

264.    Plaintiffs re-allege the allegations in the above paragraphs and incorporate the allegations by reference.

265.    In the event this Court finds that Moser, Siragusi, Ms. Lucero, Mr. Merryweather, Ms. Parr, Mr. O'Toole or any other ViSalus distributor who uttered and published defamatory statements against the individual Plaintiffs were not agents of ViSalus, Plaintiffs state this claim of conspiracy to defame against the Defendants.

266.    Defendant ViSalus engaged in a conspiracy with various independent distributors of ViSalus including Defendants Nic Sarnicola, A. Sarnicola and B. Mallen and the Moser with the PI Firm to engage in a pattern of systemically publishing defamatory statements against individual distributors, Dunn and Ocean Avenue that it believes or knows have or are likely to end a relationship with ViSalus and join Ocean Avenue and knows that the statements are false concerning the business reputation of Dunn and Ocean Avenue.

267.    The statements described above published to other ViSalus distributors or customers, which injured the business and personal reputations of the Plaintiffs, were uttered and published in furtherance of the conspiracy described herein.

4833-0536-8853.4

## FIFTEENTH CLAIM FOR RELIEF
### Tortious Interference with Contractual and Business Relations

268.   Plaintiffs re-allege each of the allegations contained in above paragraphs as if fully set forth herein.

269.   The several former Visalus distributors left Visalus and are currently all distributors for Ocean Avenue.

270.   As of November, 2012, Plaintiffs Ms. Then, Mr. Then, and Ms. Nile were all considering whether they wanted to become distributors for Ocean Avenue.

271.   As of the end of November, 2012, Ms. Then, Mr. Then an Ms. Nile all decided that they believed that working with Ocean Avenue was a better opportunity for them rather than continuing to work with ViSalus. As evidenced by its pleading in various lawsuits filed against each of these individuals, ViSalus has demonstrated that it was aware that Ms. Then, Mr. Then and Ms. Nile were involved in an economic relationship with Ocean Avenue at the latest as of December 11, 2012.

272.   Despite its knowledge that Ms. Then, Mr. Then and Ms. Nile had an economic relationship with Ocean Avenue, between December 11, 2012 and January, 2013, ViSalus engaged in acts that were designed to unjustifiably interfere with those business relationships. Among other things, ViSalus used threats and coercion tactics to force Ms. Then, Mr. Then, and Ms. Nile to each enter into contracts that would prohibit each one of them from working with Ocean Avenue.

273.   Visalus acted for an improper purpose and engaged in improper means as alleged herein to try to destroy and improperly limit Ocean Avenue's growth and opportunities as a competitor of Visalus.

4833-0536-8853.4

274.   ViSalus' improper actions actually disrupted Ocean Avenue's relationship with Ms. Then, Ms. Nile and Mr. Then.

275.   As a result of ViSalus' actions, Ocean Avenue, Ms. Then, Mr. Then, and Ms. Nile have all suffered damages in an amount to be proven at trial.

## SIXTEENTH CLAIM FOR RELIEF
## Business Defamation

276.   Plaintiff Ocean Avenue re-alleges each of the allegations contained in the above paragraphs  as if fully set forth herein.

277.   Persons holding themselves out to speak for ViSalus including but not limited to Nic Sarnicola, Mr. Mallen, Ms. Parr, Mr. O'Toole, Ms. Lucero, and Mr. Merriweather, Moser, Siragusi have all made false and defamatory statements to ViSalus distributors via Youtube videos, webpages, email, text, and/or in telephone or in-person conversations about Ocean Avenue and its management including making comments suggesting that Ocean Avenue is a dishonest company and that the company and its executives have engaged in illegal and unethical conduct.

278.   These defamatory statements were all made without reasonable care to the truth or falsity of the statements.

279.   Ocean Avenue has been greatly harmed in its reputation as a result of these defamatory statements and is entitled to damages in an amount to be proven at trial.

## SEVENTEENTH CLAIM FOR RELIEF
## Conspiracy to Engage in Business Defamation

280.   In the event this Court finds that Nic Sarnicola, Ms. Lucero, Ms. Parr, Mr. O'Toole, Mr. Merriweather, Moser, Siragusi or any other ViSalus distributor, who

uttered and published defamatory statements against Ocean Avenue are found to not be agents of ViSalus, Ocean Avenue states this count of conspiracy to defame against the Defendants.

281.   Ocean Avenue repeats and reallege each of the allegations contained in the above paragraphs as if fully set forth herein.

282.   ViSalus engaged in a conspiracy with various independent distributors of ViSalus and Moser to participate in a pattern of systemically publishing defamatory statements against Ocean Avenue that it knows to be false in order to stop ordinary but unwanted business competition and, after losing numerous successful distributors, in an attempt to stop any additional individual distributors from leaving ViSalus for better opportunities at Ocean Avenue.

283.   The statements described published to other ViSalus distributors or customers, which injured the business reputation of the Ocean Avenue, were uttered in furtherance of the conspiracy described herein.

284.   Ocean Avenue has been harmed in its reputation as a result of these defamatory statements and is entitled to damages in an amount to be proven at trial.

## EIGHTEENTH CLAIM FOR RELIEF
### Utah Practices Act
### Violation of Utah Code Ann. §§ 13-15-1 et seq.

285.   Ocean Avenue re-alleges each of the allegations contained in above paragraphs as if fully set forth herein.

286.   The deceptive and unfair actions as described throughout this complaint committed by Defendants violate the Utah Practice Act, Utah Code Ann. §§ 13-5-1 *et seq*.

287.   These actions by Defendants all caused damage to Plaintiffs in an amount to be determined at trial.

288.   Plaintiffs are entitled to recover damages plus attorneys' fees and costs.

WHEREFORE, as a result of the actions of Defendants as described herein, Plaintiffs ask that this Court award the following:

l)      Issue permanent injunctive relief against Defendants;

2)      Assess civil penalties against Defendants as required by the applicable statutes found to have been violated;

3)      Award Plaintiffs actual damages for the damage caused by Defendants' unlawful conduct in an amount to be determined at trial;

4)      Award Plaintiffs compensatory damages for the actions taken by Defendants;

5)      Award Plaintiffs their attorneys' fees and costs;

6)      Award Plaintiffs exemplary damages as allowed by common law and statute;

7)      Award Plaintiffs pre-judgment interest on any monetary award;

8)      Award such other relief as the interests of justice shall require and that this Court may deem just and proper.

## Demand for Jury Trial

Plaintiffs hereby demand a jury trial on such issues so triable.

59

DATED this 29th day of October, 2013.

        KIRTON McCONKIE

        /s/ Cameron M. Hancock
        Cameron M. Hancock
        Gregory S. Moesinger
        *Attorneys for Plaintiffs*